UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:07 CR 121 CAS |
| ) | DDN |
| HUSSEIN ALI NURE, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on June 5, 2007. At the parties' request, the undersigned gave the parties until June 19 to file post-hearing memoranda.

Defendant Hussein Ali Nure has moved to suppress evidence and statements (Doc. 130 and oral motions filed May 7, 2007), and the government has orally moved for a hearing on suppression issues (filed May 7, 2007). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. During the afternoon hours of December 28, 2006, St. Louis Metropolitan Police Detective Michael Pratt and other officers participated in a federal investigation of the presence of illegal automatic weapons at 9744 Medford in an unincorporated area of St. Louis County.[1] The officers decided to attempt to obtain voluntary entrance into the residence to continue the investigation and to retrieve the

---

[1] During the late fall of 2006, St. Louis Metropolitan Police Detective William McDonough, while detached to the Federal Bureau of Investigation's Joint Terrorism Task Force, and other law enforcement officers tracked and followed the whereabouts of two automatic machine-gun weapons to a retail gas station and then to the residence at 9744 Medford.

weapons; at that time there was no intention to arrest anyone. The officers, seven or eight in number, who were all dressed in civilian clothes except for blue windbreaker jackets that bore the word "Police," arrived at 9744 Medford at approximately 3:40 p.m. The officers were armed, but no one drew his weapon at all during the incident. Det. Sgt. Kruse and Det. Pratt approached the front door. Other officers were stationed around the building. Det. Pratt stationed himself at the corner of the building and Sgt. Kruse knocked on the front door and identified himself as a police officer.

2. Several seconds after Sgt. Kruse knocked on the door, the curtains of a nearby window parted and a black male looked out to see who was at the door. Then the officers heard a "thud" type noise of an object falling to the floor nearby inside the residence. Very shortly thereafter, the same black male[2] came to the front door. Sgt. Kruse told defendant that the police were there investigating the presence of illegal weapons in the residence. Defendant then opened the door and stepped to the side, thereby voluntarily indicating to the officers that they could enter the residence. Without any objection by defendant, all seven or eight of the officers present entered the residence. Det. Pratt then closed the front door. Neither Det. Pratt nor Sgt. Kruse had any knowledge about the defendant.

3. Inside the residence, Sgt. Kruse again explained why the officers were there. At that time defendant was dressed casually in a tee shirt and sweat pants. When he closed the front door, Det. Pratt saw on the floor near the wall and behind where the door had been when open a .25 caliber pistol. Det. Pratt immediately picked up the pistol and secured it. As Det. Pratt did so, without being asked any question, defendant spontaneously said that the gun was his and that he just used it for protection. Det. McDonough asked defendant whether anyone else was in the residence. Defendant responded that he was the only person there. The officers then made a cursory security sweep of the residence for any other person and found no one.

---

[2]Det. Pratt identified the black male as defendant Hussein Ali Nure.

4. Next, Det. Pratt asked defendant whether he would consent to a search of the residence for weapons and handed defendant a written Consent to Search form, Government Exhibit 1. He asked defendant to read it. Defendant did so and at 3:45 p.m. signed the form, thereby expressly consenting to the officers searching the residence. The officers then searched the residence for weapons. During the search, because he was the only officer who remained with defendant, for the security of the officers Det. Pratt handcuffed defendant. He and defendant then sat on chairs around a folding table in the living room.

5. During the search, the officers found and seized from a bedroom two automatic weapons which were the subjects of the earlier briefing and the subjects of the investigation. Also, the police found a cell phone which contained a photograph of a black male. The cell phone was displayed to defendant who was asked whether he could identify the subject. Defendant said it was either himself or another person he named. At no time did defendant object to the search of his residence or the seizure of the items.

6. Next, Det. Pratt orally advised defendant of his constitutional rights to remain silent and to counsel by reading them to him from a card. After each oral statement of a right, the officer asked defendant whether he understood the right and each time defendant answered in the affirmative. Throughout this procedure defendant did not appear nervous; he was calm and acted normally.

7. Approximately ten minutes after the officers entered the residence, F.B.I. Special Agents Steven Smith and Matt Brummond arrived and entered the residence. Agent Smith, knowing that defendant had been advised of his <u>Miranda</u> rights and had given his consent to the officers searching his residence, interviewed defendant in the living room. He identified himself and the other agent and then Det. Pratt uncuffed defendant. The agent asked defendant questions and defendant made oral statements. Throughout this interview, defendant was calm, lucid, and cooperative.

8. Next, Det. Pratt asked defendant whether there were any more weapons in the residence. Defendant said, "No. The only one I know is that one," referring to the .25 caliber pistol. The officer asked

defendant whether he had any paperwork on the pistol. In response, defendant said, "That's not mine. I can't really have a gun." Det. Pratt said, "I don't understand that. What do you mean by that?" Defendant responded, "I caught a dope case a couple of years ago in Minnesota and I pleaded guilty."

9. At no time on December 28, 2006, did Det. Pratt or any officer or agent draw or purposefully display his weapon to defendant. No threat or promise was made to defendant to get him to cooperate with the investigation, to make a statement, or to consent to the entry or search of the residence.

10. After the search of the residence was concluded, Det. Pratt told defendant that an arrest warrant would be applied for on account of the weapons that were seized. The officers and agents then left the residence at approximately 5:12 p.m. Defendant, who had been uncuffed, remained in the residence not under arrest.

## DISCUSSION

In his post-hearing brief (Doc. 154) defendant argues that the December 28, 2006, police activity, including his interrogation and the search, at 9744 Medford violated the Fourth Amendment. The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV.

Defendant argues that the police activity was unconstitutionally unreasonable because it occurred without a warrant; it occurred in St. Louis County and was participated in by St. Louis Metropolitan Police officers, who were acting outside their legal territorial jurisdiction (the boundaries of the City of St. Louis); there were no exigent circumstances; and there was no notice of this investigation given to the law enforcement authorities of St. Louis County. In support of this proposition, defendant adverts to Eighth Circuit case law.

Abbott v. City of Crocker, Mo., 30 F.3d 994 (8th Cir. 1994), involved a civil action for damages brought under 42 U.S.C. § 1983 based upon allegations that police officers used excessive force and effected an unauthorized arrest of the plaintiff. One of the facts involved was the pursuit of the plaintiff by an officer across the city limits of the

officer's employment jurisdiction. The court noted that the city of Crocker, Missouri, was a fourth class city whose police officers are not authorized by state law to exercise their authority outside the city limits, citing Kimber v. Dir. of Revenue, 817 S.W.2d 627 (Mo. Ct. App. 1991).[3] The Court of Appeals invoked established Supreme Court principles in rejecting the argument that the arrest was unlawful under the Fourth Amendment solely because it occurred outside the officer's territorial jurisdiction. The court stated,

> the question here is not whether the search was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. Just as a search authorized by state law may be an unreasonable one under that amendment, *so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.*

30 F.3d at 997-98 (quoting Cooper v. California, 386 U.S. 58, 61 (1967). In so ruling, the court acknowledged that other Eighth Circuit opinions were inconsistent. E.g. Bissonette v. Haig, 800 F.2d 812 (8th Cir. 1986), Cole v. Neb. St. Bd. of Parole, 997 F.2d 442 (8th Cir. 1993), Brock v. Logan County. Sheriff's Dep't of Ark., 3 F.3d 1215 (8th Cir. 1993).

The court majority in Abbott then restated the applicable rule:

> A police violation of state law does not establish a Fourth Amendment violation. However, the question of compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes.

30 F.3d at 998 (quoting United States v. Baker, 16 F.3d 854, 856 n.1 (8th Cir. 1994)).

---

[3]In Kimber v. Dir. of Revenue, 817 S.W.2d 627 (Mo. Ct. App. 1991), the Missouri Court of Appeals, in a civil action involving the suspension of a subject's Missouri state driver's license to operate a motor vehicle, while acknowledging the clear law of Missouri that officers of a fourth class city may not effect arrests outside the boundaries of the city, affirmed the existence of probable cause to arrest the driver for driving while intoxicated. 817 S.W.2d at 631-32. Cf. State v. Kilgore, 771 S.W.2d 57 (Mo. 1989)(although the state conceded in a murder case that St. Louis City police exceeded their powers to arrest under Missouri law (Mo.Rev.Stat. § 84.090) in St. Louis County, this illegality was purged by the voluntariness of the defendant's post-arrest statements). 771 S.W.2d at 61-62.

In this case, defendant's argument is without merit, because any of the St. Louis City officers' actions in participating in the investigation at or in defendant's residence was not a violation of Missouri law.  Det. Pratt and the other officers employed by the Board of Police Commissioners of the City of St. Louis, if not acting under the direction of the F.B.I.'s task force, were authorized by Missouri state law to act as they did outside the boundaries of the St. Louis city limits.  State v. Boyd, 999 S.W.2d 276, 278 (Mo. Ct. App. 1999)(St. Louis City police officers are authorized by Missouri law (Mo.Rev.Stat. § 70.820) to effect arrests in St. Louis County).

Therefore, in the case at bar the court should look to the totality of the circumstances of the incident to determine whether defendant's Fourth Amendment rights were violated.  United States v. Flores-Sandoval, 474 F.3d 1142, 1145 (8th Cir. 2007).  They were not.

Defendant complains that the initial warrantless entry of the police into his residence and the subsequent search violated the Fourth Amendment.  However, the lack of a warrant, generally required by the Fourth Amendment, becomes unnecessary when the actions of the officers are voluntarily consented to by the defendant.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Bradley, 234 F.3d 363, 366-67 (8th Cir. 2000).

The record indicates, the defendant does not gainsay, and the undersigned concludes that defendant voluntarily consented to the officers entering his residence without a warrant.  The officers reasonably believed defendant had the authority to consent to their warrantless entry into his residence and that he did so consent.  Thus, the officers' warrantless entry did not violate the Fourth Amendment. See United States v. Matlock, 415 U.S. 164, 171 (1974); cf. Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990); United States v. Yang, 345 F.3d 650, 656 (8th Cir. 2003)("The officer may ask for consent to search and if consent is given, act on whatever information he acquires").

Defendant's consent to the entry was voluntary, because it was not the product of any coercive action by the police.  Defendant was not threatened or intimidated or promised anything by the police in exchange for their being allowed to enter the residence.  Defendant did not

object to the entry, even after being told why the officers were there. For the same reasons, after the officers entered the residence, nothing in the evidence indicated that the defendant's ability not to consent to a police search of the residence was impeded or limited by the police. In sum, defendant voluntarily consented to the officers' entry and to their search of the residence.

The initial seizure by Det. Pratt of the pistol from the floor near the front door was lawful even without a warrant. The exigent circumstances at the time justified the seizure of the weapon under the Fourth Amendment. Warden v. Hayden, 387 U.S. 294, 298-99 (1967). When he seized the pistol, Det. Pratt knew that the officer's initial knocking on the front door was soon followed by the sound of an item hitting the floor nearby inside the residence. When the door opened soon thereafter and the gun was seen, not only was it reasonable to believe that defendant had some relationship to the weapon but also the seizure of the weapon from a place of obvious concealment was necessary for the security of the officers.

Further, the officers were authorized by the reasonableness standard of the Fourth Amendment to make a cursory security sweep of the residence for the presence of any other occupant who could harm them, especially given the fact that the subject matter of their investigation was the presence of illegal automatic weapons. Maryland v. Buie, 494 U.S. 325, 327 (1990).

For these reasons, the physical evidence obtained by the police from the residence should not be suppressed.

Similarly, except as set forth below, defendant's statements to the police should not be suppressed. The government has the burden of establishing the constitutional admissibility of defendant's statements by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). The admissibility of a defendant's statements depends upon whether the statements were constitutionally voluntary, id. at 169; and, if the statements are made during police interrogation while the defendant was in custody, whether the defendant had been advised of his rights, as prescribed by Miranda v. Arizona, 384 U.S. 436 (1966); and, if so, whether the defendant knowingly and voluntarily waived the

Miranda rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979).

Defendant's statements were all constitutionally voluntary, because they were not the result of government overreaching, such as mental or physical coercion, deception, or intimidation. Colorado v. Connelly, 479 U.S. at 169-70. Rather, defendant had decided to cooperate with the police.

The statement made by defendant regarding his ownership of the pistol found behind the front door was not subject to the requirements of Miranda, because the statement was not made in response to interrogation, but was spontaneously made. United States v. Menteer, 350 F.3d 767, 770 (8th Cir. 2003), cert. granted and judgment vacated, 544 U.S. 916 (2005), opinion reinstated on remand, 408 F.3d 445 (8th Cir. 2005).

The statements made by defendant after he was handcuffed by Det. Pratt were subject to the requirements of Miranda v. Arizona, because defendant was then in custody. Considering the indicia of whether one is in custody for Miranda purposes, the record does not indicate that defendant was told he was free to leave; many officers were inside his residence and the door was closed by an officer; defendant was seated at a table with an officer and was in handcuffs; and he did not initiate the original contact with the officers, although he consented to their entry into the residence. Therefore, a reasonable person in defendant's position would not have thought he was free to leave, and defendant was in custody for Miranda purposes. United States v. Brown, 990 F.2d 397, 399-400 (8th Cir. 1993).

Therefore, the statement made by defendant about the photographic image on the cell phone[4] should be suppressed as evidence against him.

The subsequent statements made by defendant were made after he had been advised of his Miranda rights and waived them.

Whereupon,

---

[4] See Finding 5, above.

**IT IS HEREBY ORDERED** that the oral motion of the government for a hearing on suppression issues (filed February 6, 2007) is denied as moot.

**IT IS HEREBY RECOMMENDED** that the motions of defendant to suppress evidence and statements (Doc. 130 and oral motion filed February 6, 2007) be sustained as to the statements made about the seized cell phone and which are described in Finding 5. In all other respects, the motion should be denied.

The parties are advised they have until June 26, 2007, in which to file written objections to this Order and Recommendation. The failure to file objections will waive the right to appeal issues of fact.

    /S/ David D. Noce
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 18, 2007.